```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/30/2024
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GHAMDAN ABDULLAH MAFLAHI, 875 E
TREMONT GROCERY DELI CORP,

              Plaintiffs,

   - against -

UNITED STATES OF AMERICA, UNITED
STATES DEPARTMENT OF AGRICULTURE,
FOOD & NUTRITION SERVICE,

              Defendants.

**23 Civ. 2704 (VM)**

**DECISION AND ORDER**

      **VICTOR MARRERO, United States District Judge.**

      Plaintiffs Ghamdan Abdullah Maflahi ("Maflahi") and 875 E Tremont Grocery Deli Corp. ("E Tremont Grocery" or the "Store," and together with Maflahi the "Plaintiffs") bring this action pursuant to 7 U.S.C. § 2023(13) and 7 C.F.R. § 279.7 challenging the March 2, 2023, final agency decision by the Food and Nutrition Service ("FNS"), a division of the United States Department of Agriculture ("USDA"), permanently disqualifying E Tremont Grocery from the Supplemental Nutrition Assistance Program ("SNAP" or the "Program") upon a finding that the Store engaged in trafficking of SNAP benefits, as defined in C.F.R. § 271.2. E Tremont Grocery, a food retailer located in Bronx County, New York, and its owner Maflahi assert that the FNS wrongfully terminated their participation in SNAP, that the decision was arbitrary and

capricious, and that it deprived them of their due process rights. (See Complaint ("Compl."), Dkt. No. 1; Plaintiffs' Memorandum of Law in Opposition to the Government's Motion for Summary Judgment ("Opp."), Dkt. No 31.)

Pending before the Court is the Motion for Summary Judgment (the "Motion") filed by defendants United States of America, the USDA, and the FNS (collectively, "Defendants"), pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"). (See Defendants' Notice of Motion, Dkt. No. 22.) Defendants argue that they are entitled to judgment as a matter of law because there is no genuine issue of material fact with respect to the validity of the FNS's determinations that Plaintiffs engaged in trafficking of SNAP benefits and that Plaintiffs failed to provide substantial evidence demonstrating that the requirements for an imposition of a civil money penalty ("CMP") in lieu of permanent disqualification were met. (See Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem."), at 14, Dkt. No. 24.) Furthermore, Defendants contend that Plaintiffs' due process claim fails as a matter of law because this Court's de novo review satisfies Plaintiffs' due process rights. (See id. at 24.)

For the reasons stated below, Defendants' Motion is **GRANTED**.

## I.    __BACKGROUND__[1]

A. <u>SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM</u>

SNAP provides monthly allotments to qualifying households for the purchase of eligible food items at authorized retail stores. <u>See</u> Food Stamp Act of 2008 (the "Act"), 7 U.S.C.§§ 2011-36. (<u>See</u> <u>also</u> Defs.' Stmt." ¶ 2.) The Program aims to "permit low-income households to obtain a more nutritious diet . . . by increasing food purchasing power." 7 U.S.C. § 2011. The FNS, a division of the USDA, administers the Program. (<u>See</u> Defs.' Stmt. ¶ 1.)

Qualifying households receive SNAP benefits through Electronic Benefit Transfer ("EBT") cards that function like debit cards, with SNAP benefits credited to the EBT account each month. <u>See</u> 7 U.S.C. § 2016(h); 7 C.F.R. §§ 274.2(b), 274.3(b). (<u>See</u> Defs.' Stmt. ¶ 3; Yorgason Decl. ¶ 3.) A SNAP recipient may purchase eligible items at any authorized

---

[1] Except as otherwise noted, the following background derives from the facts as set forth by Defendants in their Rule 56.1 Statement of Undisputed Material Facts (<u>see</u> "Defs.' Stmt.," Dkt. No. 25), a supporting Declaration of Jon Yorgason, the Branch Chief for the Administrative and Judicial Review Branch of the FNS (<u>see</u> "Yorgason Decl.," Dkt. No. 23), and the certified copy of the administrative record (<u>see</u> "A.R.," Dkt. No. 21). As noted below, Plaintiffs have neither filed a Counter-Statement as required by Local Civil Rule 56.1(b), nor submitted admissible evidence to supplement the administrative record or to refute the evidence submitted by Defendants in their Motion. The Court has also considered the full record submitted by the parties, including factual averments and admissions made previously in the record. No further citations to the record will be made herein except as specifically noted. The Court construes any disputed facts discussed in this section and the justifiable inferences arising therefrom in the light most favorable to the non-movant, as required under the standard set forth in Section II below.

retail food store with her EBT card. (<u>See</u> Defs.' Stmt. ¶ 3; Yorgason Decl. ¶ 3.) The USDA obtains a record of each EBT transaction when it occurs. (<u>See</u> Defs.' Stmt. ¶ 4; Yorgason Decl. ¶ 4.)

When a retailer applies to participate in SNAP, the FNS typically sends a contractor to photograph the store and obtain relevant information, such as store size, available food items, and layout. (<u>See</u> Yorgason Decl. ¶ 10.) The store is classified according to its characteristics (<u>e.g.</u>, convenience store, small/large grocery store, superstore). (<u>See</u> <u>id.</u> ¶ 13.) Additionally, store owners must certify that they are familiar with and will adhere to the Act and its implementing regulations ("SNAP Regulations") and that they are subject to penalties, including disqualification, for violating those regulations. <u>See</u> 7 U.S.C. § 2021(a)-(b); 7 C.F.R. § 278.6(a), (e)(1)(i). (<u>See</u> Yorgason Decl. ¶ 5.) SNAP benefits may be used only for eligible items, and participating stores are prohibited from accepting EBT benefits as payment for ineligible items, such as alcohol, tobacco, and prepared hot foods. <u>See</u> 7 C.F.R. § 278.2(a). (<u>See</u> Yorgason Decl. ¶ 5.) Participating stores are also forbidden from exchanging SNAP benefits for "cash or consideration other than eligible food," a practice defined

as "trafficking." 7 C.F.R. §§ 271.2, 278.6(a). (See Yorgason Decl. ¶ 5.)

To ensure compliance with the SNAP Regulations, the FNS electronically monitors participating stores' EBT transactions, periodically reviews stores, and initiates investigations when it identifies suspicious EBT transaction data. (See Defs.' Stmt. ¶ 5; Yorgason Decl. ¶ 8.) The FNS utilizes a computerized system called the Anti-Fraud Locator Using EBT Retailer Transactions ("ALERT System") that reviews EBT records and identifies suspicious transactions, generating a "flag" that is stored in the system for each. (See Defs.' Stmt. ¶¶ 4, 6; Yorgason Decl. ¶ 8.)

The FNS's Retailer Operations Division ("ROD") initiates an investigation when the ALERT System identifies patterns of EBT data consistent with trafficking at a particular retailer. (See Yorgason Decl. ¶ 11.) A Program Specialist then prepares an ALERT Case Analysis Document for the Section Chief, recommending whether the retailer engaged in potential trafficking based on a review of the retailer's relevant EBT transaction records, a comparison of the retailer's EBT records to those of nearby or comparably classified retailers, SNAP redemption data at the national, state, and county level during the review period, and information gathered during store visits conducted after the retailer has

been flagged for potential trafficking. (See id. ¶¶ 12-14.)
If the Section Chief agrees that the store more likely than
not engaged in trafficking, the FNS issues a "charge letter"
to the retailer. 7 C.F.R. § 278.6(b). (See id. ¶ 15.)

The FNS issues the trafficking determination upon
reviewing the charge letter, "the response, and any other
information available." 7 C.F.R. § 278.6(c). In the event of
a finding of trafficking, the retailer may request
administrative review and submit additional supporting
information. See id. §§ 278.6(n), 279.4(b). If the FNS
Administrative Review Officer upholds the trafficking
determination, the retailer may obtain judicial review in the
district court. See id. § 279.7(a).

B. FNS INVESTIGATION OF E TREMONT GROCERY

The FNS approved E Tremont Grocery as an authorized SNAP
retailer on January 16, 2015, and classified it as a
"convenience store." (A.R. 9, 17.) In August 2019, the ROD
initiated an investigation of the Store because the ALERT
System identified patterns of EBT transactions there
consistent with trafficking from July through October 2019
(the "Review Period"). (See Yorgason Decl. ¶ 11; A.R. 168-
81, 189.) The ALERT System flagged 428 transactions falling
into two categories of suspicious activity. (See A.R. 212-
22.) First, "multiple transactions" made from the accounts of

"single SNAP household[s] within short time frames" (the "Multiple Transactions"), which is a method stores use "to avoid single high dollar transactions that cannot be supported and are indicative of trafficking." (A.R. 198.) Second, "transactions that are large based on the observed store characteristics and recorded food stock" (the "Large Transactions"). (A.R. 199.) During the Review Period, there were 86 flagged Multiple Transactions at the Store, totaling $4,151.30. Those were divided into 38 "sets," or instances where the same household made multiple EBT transactions within a one- to three-day period at the Store.[2] (A.R. 212-16.) There were 342 flagged Large Transactions, ranging from $32.00 to $115.49 and totaling $17,126.00.[3] (See A.R. 217-22.)

Thereafter, an FNS contractor visited the Store on October 26, 2019 (the "October Store Visit"). (See Yorgason Decl. ¶ 14; A.R. 60-108.) An FNS contractor also visited the Store on December 7, 2019 (the "December Store Visit") in connection with the Store's SNAP reauthorization. (See Yorgason Decl.

---

[2] On August 8, 2019, for example, the same household made purchases of $36.00, $53.00, and $36.00 at 1:45 am, 3:01 am, and 4:50 am, respectively. (See A.R. 212, at Transactions 15-17.) On October 4, 2019, a different household made a purchase of $73.99 at 4:14 pm then returned at 7:30 pm to make a purchase of $53.99. (See A.R. 213, at Transactions 20-21.)

[3] Of the 342 Large Transactions, 148 had a value of $50.00 or more (Transactions 87-235), 58 had a value over $70.00 (Transactions 87-145), and 8 had a value over $90.00 (Transactions 87-95). (See A.R. 216-19.)

¶ 14; A.R. 109-49.) A store employee consented to both visits. (See A.R. 61, 110.) During those visits, the FNS contractor photographed E Tremont Grocery and recorded that the Store had approximately 1,250 square feet of retail space, one cash register, and no shopping baskets or carts. (See A.R. 60, 109.) A map of the Store's layout prepared in December 2019 depicted shelves and refrigerators around the perimeter and three free-standing shelves in the Store's center. (See A.R. 115.) The contractor noted the presence of "empty shelves." (A.R. 61, 110.) There was no evidence that the Store conducted wholesale business, the Store did not sell meat or seafood bundles or fruit and vegetable boxes, and the Store did not take telephone or online orders and did not offer delivery. (See A.R. 60-61, 109-10.) As of October and December 2019, the most expensive SNAP eligible items were a container of Enfamil infant formula for $20.99 and assorted deli meats and cheeses from $6.99 to $8.99 per pound. (See A.R. 61, 110.)

    1. <u>Program Specialist's December 2019 Report</u>

In December 2019, an FNS Program Specialist prepared an Alert Case Analysis Document recommending that a trafficking charge letter be issued because the evidence "established clear and repetitive patterns of unusual, irregular, and inexplicable SNAP activity" at E Tremont Grocery. (A.R. 208;

see also A.R. 188-208.) To reach her determination, the Program Specialist analyzed the flagged EBT data, information collected during the FNS store visits, comparative store data, the availability of local competitors, and individual households' SNAP data. The Large Transactions, the Store's characteristics, EBT data from "all convenience store competitors," and the availability of "numerous other surrounding stores," all of which "are better equipped and more amply stocked," led the Program Specialist to conclude that the Store's "quality and quantity of stock do not merit SNAP recipients conducting so many high-dollar transactions," as E Tremont Grocery "does not sell any unique items that cannot be purchased at other stores in the area." (A.R. 199-202.)

Moreover, the Program Specialist highlighted the Multiple Transactions demonstrating that the households in question made "multiple, large purchases" at E Tremont Grocery, a convenience store, "immediately before or after visiting a store with superior stock, variety of items, pricing and ease of checkout, such as a supermarket or superstore." (A.R. 202-03.) Those households also traveled up to a half mile to make repeated and/or large transactions at E Tremont Grocery, despite the availability of other convenience stores located

9

on the same block as the households' addresses.[4] (See A.R. 203-08.)

### 2. Charge Letter

By charge letter dated December 13, 2019 (the "Charge Letter"), Section Chief Denise Thomas notified Maflahi that the FNS was "charging [his] firm with trafficking" SNAP benefits, as defined in 7 C.F.R. § 271.2, based on an analysis of EBT transaction records during the Review Period that "establish[ed] clear and repetitive patterns of unusual, irregular, and inexplicable activity" for Maflahi's type of store. (A.R. 209; see also A.R. 210-11.) A list of the 428 flagged transactions was enclosed, with the Multiple Transactions as Attachment 1 and the Large Transactions as Attachment 2. (See A.R. 212-22.) The Charge Letter informed Maflahi that he had a "right to reply to the charges" and that he could request the imposition of a CMP in lieu of disqualification, as long as he met the "four criteria listed [in 7 C.F.R. § 278.6(i)] and provide[d] the documentation as specified within 10 calendar days." (A.R. 209-10.) When a retailer responds to a charge letter, the FNS considers that response along with other available evidence to determine if

---

[4] One household traveled a half mile from its home address to make a $100.00 purchase at the Store despite making a $27.13 purchase at a supermarket 12 minutes earlier. (See A.R. 207-08.)

trafficking more likely than not occurred. (See Yorgason Decl. ¶ 23.)

### 3. Response Letter and Additional Correspondence

By letter dated December 20, 2019 (the "December 2019 Letter"), Plaintiffs, through counsel, contested the Charge Letter's allegations and stated that the December 2019 Letter was "a confirmation of an extension of [Plaintiffs'] response deadline." (A.R. 225.) The same day, Plaintiffs submitted a Freedom of Information Act ("FOIA") request seeking, among other things, all records in the FNS's possession "relating to the Store" and "reviewed or relied upon in connection with the [Charge Letter]." (A.R. 226.) By letter dated July 27, 2021, the FNS alerted Plaintiffs' counsel that it had responded to Plaintiffs' FOIA request on July 14, 2021, but that Plaintiffs had not yet responded to the Charge Letter. The FNS informed Plaintiffs that they "must reply within 10 calendar days" to "present any information, explanation, or evidence" regarding the trafficking charges. (A.R. 231.)

On August 6, 2021, the FNS received a response to the Charge Letter (the "Response Letter") from Plaintiffs' attorney.[5] (See A.R. 236-86.) Plaintiffs did not deny that

---

[5] Enclosed with the Response Letter were: (1) a study titled "U.S. Grocery Shopping Trends, 2016," by the Food Marketing Institute (see A.R. 287-324); (2) invoices from AAA Wholesale Distributors Corp. from July 1, 2019, to December 31, 2019 (see A.R. 325-30); (3) affidavits of seven EBT

the flagged transactions occurred, but offered alternative explanations to show that the transactions were legitimate. Namely, that the Multiple Transactions were "easily explained by either (1) the participant forgetting an item . . . ; (2) co-shopping; (3) the participant making a purchase, returning home, and then returning to the Store to make a second purchase; [or] (4) a reflection of the normal shopping habits of SNAP participants." (A.R. 279.) Likewise, Plaintiffs contended that the Large Transactions were "the result of the Store's inventory, co-shopping, and/or are the normal reflections of a SNAP participant's shopping habits." (A.R. 279.)

Plaintiffs first argued that the October Store Visit Report "show[ed] the Store to be sufficiently stocked to account for the transactions listed in the Charge Letter." (A.R. 244; see

---

customers of E Tremont Grocery (see A.R. 331-37); (4) E Tremont Grocery's bank statements from June 29, 2019, through November 29, 2019 (see A.R. 338-67); (5) a report titled "Benefit Redemption Patterns in the Supplemental Nutrition Assistance Program in Fiscal Year 2017" prepared by Insight Policy Research (see A.R. 368-476); (6) invoices from Summit Provisions from July 6, 2019 to October 26, 2019 (see A.R. 477-93); (7) an article titled "Know Your Core, Protect Your Core" by Angela Hanson, published in the April 2016 issue of "Convenience Store News for the Single Store Owner" (see A.R. 494-97); (8) a November 2016 USDA report titled "Foods Typically Purchased by Supplemental Nutrition Assistance Program (SNAP) Households" (see A.R. 498-546); (9) undated photographs of E Tremont Grocery showing food stock (see A.R. 547-55); (10) a USDA document entitled "Profile of SNAP Households in 2018" (see A.R. 556); (11) a photo of the Store's New York State and Local Quarterly Sales and Use Tax Return form ST-100 for the 2019 Second Quarter Tax Period (see A.R. 557-59); and (12) a letter dated January 29, 2020, from Jetro/Restaurant Depot concerning purchases made between July 1,2019, and October 31, 2019 (see A.R. 560).

<u>also</u> A.R. 277.) They asserted that the FNS contractor "missed" "higher priced items" during the October Store Visit, including cases of Red Bull, Monster Energy, and Ensure, priced at $47.99 per case. (A.R. 244.) Plaintiffs included "Bank Statements, Invoices, and Sales Tax" from the Review Period, as well as undated photos of the Store, purporting to show that there were "adequate eligible food items to account for the transactions." (A.R. 245; <u>see</u> <u>also</u> A.R. 325-30, 338-67, 477-93, 547-60.)

Additionally, Plaintiffs challenged "the assumptions utilized in the [FNS's] standard analysis of [EBT] transactions," arguing that the Store's location in an urban, low-income neighborhood in the Northeast/Mid-Atlantic region and proximity to SNAP beneficiaries more likely to shop at convenience stores and small grocers explained the prevalence of large and frequent transactions there.[6] (A.R. 250; <u>see</u> <u>also</u> A.R. 263.) Plaintiffs pointed to studies and USDA data for support, and submitted affidavits of seven customers who attested to making repeated, large purchases. (<u>See</u> A.R. 250; <u>see</u> <u>also</u> A.R. 276, 287-324, 331-37, 368-476, 498-546.)

---

[6] Plaintiffs argued that "the numbers show that if a store is in the Mid-Atlantic or Northeast, near a large number of Hispanic or African American SNAP households that are comprised of one adult and children, who have more than $500 worth of benefits and four or more household participants – the store is much, much more likely to be flagged through no fault of its own." (A.R. 263.)

Plaintiffs did not request a CMP in lieu of disqualification in their Response Letter.

C. SANCTION AND ADMINISTRATIVE APPEAL

From August 6 to October 1, 2021, the Program Specialist and Section Chief considered Plaintiffs' Response Letter along with other available information and prepared an "EBT Retailer Reply and Case Sanction Recommendation" (the "Sanction Recommendation") regarding E Tremont Grocery. (See Yorgason Decl. ¶ 23; A.R. 562-89.) The Sanction Recommendation determined that (1) it was more likely than not that trafficking occurred at the Store; (2) Plaintiffs did not sufficiently explain the transactions in the Charge Letter; and (3) permanent disqualification was warranted. (See A.R. 589.)

Specifically, the Sanction Recommendation noted that the undated photos Plaintiffs submitted showed fully stocked shelves and items that were not present during the October Store Visit, which also established that the Store did not sell cases of beverages. (See A.R. 563-66.) Moreover, despite Plaintiffs' "hypothetical explanations" for the Multiple Transactions, it was unlikely that "excessively large transactions would be conducted multiple times in a short time period" because the Store "does not offer anything that would have customers constantly shop at this location."

14

(A.R. 567, 569.) Rather than justifying the Large Transactions, the invoices Plaintiffs submitted revealed a discrepancy of $69,450.58 between the amount of SNAP-eligible stock purchased and SNAP redemptions during the Review Period, assuming a 40 percent mark-up on SNAP-eligible food items.[7] (See A.R. 575.) Likewise, only three of the seven clients who submitted affidavits on Plaintiffs' behalf shopped at the Store during the Review Period, and the EBT records of two of those clients revealed that they spent less than they attested to spending in their affidavits.[8] (See A.R. 578-88.)

By letter dated October 1, 2021, the FNS informed Plaintiffs that it found that the violations cited in the Charge Letter occurred and that Plaintiffs were therefore permanently disqualified from SNAP. (See A.R. 590-91.) Plaintiffs requested review of the agency decision on October 8, 2021. (See A.R. 604.) In an appeal of an adverse FNS

---

[7] During the four-month review period, E Tremont Grocery's SNAP-eligible food purchases with a 40 percent standard mark-up totaled $14,595.08, whereas the Store recorded $84,045.66 in SNAP redemptions during the same period. FNS assumes a 40 percent mark-up on SNAP-eligible items when, as here, the store does not provide a mark-up. (See A.R. 575.) Even assuming a 100 percent mark-up, there would be a $63,195.54 discrepancy between Plaintiffs' SNAP-eligible inventory and collected SNAP redemptions.

[8] One client attested that she spent $80 at E Tremont Grocery, but her EBT transaction data during the Review Period showed that she spent no more than $26.00. (See A.R. 580.) Another client stated that she spent $45 at the Store, but her EBT transaction data during the Review Period showed that she spent no more than $21.00. (See A.R. 582-84.)

action, the appellant bears the burden of proving by a preponderance of the evidence that the administrative action should be reversed. (See A.R. 722.) By letter dated October 14, 2021, the FNS informed Plaintiffs of their right to submit additional information in support of their position. (See A.R. 606.) Plaintiffs submitted a letter authored by Maflahi and forty-six customer receipts from the Review Period (see A.R. 615-65), but otherwise submitted the same documentation put forth in response to the Charge Letter (see A.R. 666-719).

On March 2, 2023, Administrative Review Officer Michelle Waters ("Waters") issued a written decision (the "Final Agency Decision") upholding the permanent disqualification of E Tremont Grocery from SNAP. (See A.R. 720.) Regarding the newly submitted evidence, Waters noted that the customer receipts accounted for only 24.4 percent of the transactions on Charge Letter Attachment 1 and 13.5 percent of the transactions on Charge Letter Attachment 2. (See A.R. 730.) Moreover, the receipts were further proof that the Store sold mainly items that cost less than $2. (See id.)

D. PROCEDURAL HISTORY

Plaintiffs commenced the instant action on March 31, 2023, seeking review of the Final Agency Decision. (See Compl.) Plaintiffs categorically denied having trafficked in

16

SNAP benefits, alleged that the FNS's determination was arbitrary and capricious and invalid under Section 278.6(d) of the SNAP Regulations, and alleged that the FNS's decision was rendered in violation of Plaintiffs' due process rights. (See Compl.¶¶ 20-21, 32-33, 37.) Plaintiffs therefore ask the Court to vacate the FNS's final decision permanently disqualifying E Tremont Grocery from SNAP. (See id. ¶ 38.)

After answering the Complaint (see Dkt. No. 11), Defendants moved for summary judgment on December 13, 2023 (see Dkt. No. 22), supporting their Motion with a Memorandum of Law (see "Defs.' Mem.," Dkt. No. 24), a Declaration by a person with knowledge of the agency decision (see Yorgason Decl.), and the required Local Civil Rule 56.1 Statement (see Defs.' Stmt.). On April 15, 2024, Plaintiffs submitted their Opposition, consisting solely of a Memorandum of Law. (See "Opp.," Dkt. No. 31.) Plaintiffs submitted no affidavits or declarations, or any documentary evidence, to support the arguments they raised in opposition to Defendants' Motion. They also submitted no Counter-Statement as required under Local Civil Rule 56.1. Defendants submitted their reply on May 22, 2024. (See "Reply," Dkt. No. 34.)

## II.  **LEGAL STANDARD**

A. SUMMARY JUDGMENT

Summary judgment must be granted if the admissible evidentiary record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Samuels v. Mockry, 77 F.3d 34, 35 (2d Cir. 1996). A factual dispute is material if it "might affect the outcome of the suit," and it is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48 (emphasis in original). Moreover, on a motion for summary judgment, the Court's role "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986).

The movant bears the initial burden of demonstrating the absence of any genuine issues of material fact. See Celotex, 477 U.S. at 323; Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004). Whereas the non-movant bears the burden of proof

at trial, the movant's burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim. Celotex Corp., 477 U.S. at 324-25.

If the movant satisfies its burden, the non-movant may defeat summary judgment only by "com[ing] forward with specific facts showing that there is a genuine issue of material fact for trial." Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003); Anderson, 477 U.S. at 250. The non-movant "cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts,'" Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)), and "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004) (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)).

Summary judgment is improper if any admissible evidence in the record allows a reasonable inference to be drawn in favor of the opposing party as to the issue on which summary judgment is sought. See Gummo v. Vill. of Depew, N.Y., 75 F.3d 98, 107 (2d Cir. 1996). Where a party "fails to properly address [the opposing] party's assertion of fact . . ., the

19

court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

This Court's Local Rules further provide that a party moving for summary judgment under Rule 56 must submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a); see Muazeb, 2019 WL 1613433, at *6 (S.D.N.Y. Mar. 28, 2019). The opposing party must respond with a counter-statement that "admit[s] or den[ies], and otherwise respond[s] to, each numbered paragraph in the statement of the moving party." Local Civ. R. 56.1(b); see Muazeb, 2019 WL 1613433, at *6. Each statement made by the moving party that is not "specifically denied and controverted by a correspondingly numbered paragraph" in the opposing party's counter-statement "will be deemed to be admitted." Local Civ. R. 56.1(c); see Muazeb, 2019 WL 1613433, at *6. The Court may not, however, "rely solely on the [movant's] statement of undisputed facts . . .; it also must be satisfied that the moving party's assertions are supported by the record." Muazeb, 2019 WL 1613433, at *6 (citing Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) and Zerafa v. Montefiore Hosp. Hous. Co., 403 F. Supp. 2d 320, 329 n.12 (S.D.N.Y. 2005)).

B. JUDICIAL REVIEW OF A DISQUALIFICATION DETERMINATION BASED

   ON TRAFFICKING

   1. *De Novo* Review of a Final FNS Trafficking

      Determination

   Judicial review of a final decision by the FNS

disqualifying a firm from participation in SNAP upon a finding

of a trafficking violation is a "two-step process." La Reyna

De Westchester Deli Grocery Corp. v. United States Dep't of

Agric., 671 F. Supp. 3d 476, 482 (S.D.N.Y. 2023); see also

Bros. Grocery & Deli Corp. v. United States, No. 20 Civ.

06961, 2021 WL 4443723, at *6 (S.D.N.Y. Sept. 28, 2021).

First, the Court must determine *de novo* whether a trafficking

violation warranting disqualification occurred. See La Reyna

De Westchester, 671 F. Supp. 3d at 482; see also 7 U.S.C.

§ 2023(a)(15). Under the applicable SNAP regulation, unlawful

"trafficking" in SNAP benefits includes:

> [t]he buying, selling, stealing, or otherwise effecting
> an exchange of SNAP benefits issued and accessed via
> Electronic Benefit Transfer (EBT) cards, card numbers
> and personal identification numbers (PINs), or by manual
> voucher and signature, for cash or consideration other
> than eligible food, either directly, indirectly, in
> complicity or collusion with others, or acting
> alone. . . .

7 C.F.R. § 271.2(1).

   "The Food Stamp Act's *de novo* review provision embodies

a different and broader scope of review than that available

under the [Administrative Procedure Act]," requiring "a reexamination of the entire matter rather than a mere determination of whether the administrative findings are supported by substantial evidence." Ibrahim v. United States, 834 F.2d 52, 53 (2d Cir. 1987) (quoting Saunders v. United States, 507 F.2d 33, 36 (6th Cir. 1974) (quotations omitted)). Hence, the Court "should not limit its consideration to matters previously appraised in the administrative proceedings." Nadia Int'l Mkt., 689 F. App'x at 33 (quoting Ibrahim, 834 F.2d at 53-54).

At this first step, Plaintiffs, "as the parties challenging their permanent disqualification from SNAP, bear the burden of proving by a preponderance of the evidence that the agency's action was 'invalid.'" Capellan v. United States, No. 17 Civ. 9342, 2020 WL 1047907, at *3 (S.D.N.Y. Mar. 4, 2020) (quoting Arias v. United States, No. 13 Civ. 8542, 2014 WL 5004409, at *6 (S.D.N.Y. Sept. 29, 2014)); see also Duchimaza v. United States, 211 F. Supp. 3d 421, 428 (D. Conn. 2016) (noting that, while the Second Circuit has not yet addressed this issue, district courts within the Circuit have held that plaintiffs bear the burden of proving by a preponderance of the evidence that the disqualification was invalid). To meet this burden, "the plaintiff must demonstrate that 'each cited instance of trafficking' was

invalid, as the FNS may permanently disqualify a participant
after even just one instance of trafficking." Capellan, 2020
WL 1047907, at *3 (quoting S.S. Grocery, Inc. v. U.S. Dep't
of Agriculture, Food & Nutrition Serv., 340 F. Supp. 3d 172,
180 (E.D.N.Y. 2018) (emphasis added)). Although the Court
reviews the record de novo, "summary judgment is a proper
method of disposing of an action pursuant to
7 U.S.C. § 2023(a)(13) if no issues of fact are presented."
Bros. Grocery & Deli Corp., 2021 WL 4443723, at *6.

　　　2. Arbitrary and Capricious

　　　Second, if the Court finds that trafficking has
occurred, the Court must "determine whether the agency's
imposed sanction was 'arbitrary or capricious, i.e., whether
it was unwarranted in law without justification in fact.'"
Muazeb, 2019 WL 1613433, at *8 (quoting Willy's Grocery v.
United States, 656 F.2d 24, 26 (2d Cir. 1981) (internal
quotation omitted)). "Whether a penalty is arbitrary or
capricious 'is a matter of law appropriately determined on a
motion for summary judgment.'" Bros. Grocery & Deli Corp.,
2021 WL 4443723, at *6 (quoting Yafaie v. United States, No.
94 Civ. 7825, 1995 WL 422169, at *1 (S.D.N.Y. Jul. 18, 1995));
see also Guzman v. United States Dep't of Agric. Food &
Nutrition Serv., 931 F. Supp. 2d 488, 494 (S.D.N.Y. 2013);
183 Bronx Deli Grocery Corp. v. United States, No. 11 Civ.

1527, 2012 WL 2359664, at *4 (S.D.N.Y. June 18, 2012). The "'arbitrary or capricious' standard requires an agency's decision be given substantial deference." Arias, 2014 WL 5004409, at *11 (citing Soler v. G. & U., Inc., 833 F.2d 1104, 1107 (2d Cir. 1987)). Under this standard, the Court "is not empowered to substitute its judgment for that of the agency." Id. (quoting Friends of the Ompompanoosuc v. Fed. Energy Regul. Comm'n, 968 F.2d 1549, 1554 (2d Cir. 1992)).

An agency may not be found to have acted arbitrarily and capriciously where it has imposed a sanction in accordance with its own regulations and procedures. See Willy's Grocery, 656 F.2d at 26; see also Arias, 2014 WL 5004409, at *11; 183 Bronx Deli, 2012 WL 2359664, at *4 ("Courts in this District have repeatedly held that, if the agency has followed its guidelines, the reviewing court may not overturn the decision as arbitrary and capricious." (quoting Lugo v. United States, No. 08 Civ. 2960, 2009 WL 928136, at *2 (S.D.N.Y. Mar. 30, 2009) (quotation marks and alteration omitted)); Nagi v. U.S. Dep't of Agric., No. 96 Civ. 6034, 1997 WL 252034, at *3 (S.D.N.Y. May 14, 1997); Young Jin Choi v. United States, 944 F. Supp. 323, 325 (S.D.N.Y. 1996). In short, if "the penalty imposed is in accordance with the settled policy of the FNS, it is not arbitrary or

capricious." <u>Yafaie</u>, 1995 WL 422169 at *1 (citing <u>Lawrence v. United States</u>, 693 F.2d 274, 277 (2d Cir. 1982)).

### 3. <u>Due Process</u>

Finally, the requirements of procedural due process are met where, upon a challenge to an FNS determination to disqualify a firm from SNAP, the Court reviews the disqualification *de novo*, under the framework set out above. See <u>Ibrahim</u>, 834 F.2d at 54. With respect to substantive due process, "as no fundamental right is implicated by a [SNAP] disqualification decision," the Court must determine only whether the disqualification was rationally related to a legitimate government purpose. <u>Muazeb</u>, 2019 WL 1613433, at *8; <u>see Nagi</u>, 1997 WL 252034, at *3 ("Substantive due process claims not involving a fundamental right are reviewed under the rational basis test."). The "prevention of illegal activity is a legitimate government purpose." <u>Muazeb</u>, 2019 WL 1613433, at *8.

### III. <u>DISCUSSION</u>

### A. <u>PLAINTIFFS TRAFFICKED SNAP BENEFITS</u>

The Court first determines *de novo* whether Plaintiffs have met their "burden of proving by a preponderance of the evidence" that the cited instances of trafficking were "invalid." <u>Capellan</u>, 2020 WL 1047907, at *3 (quoting <u>Arias</u>, 2014 WL 5004409, at *6). Based on a review of the

administrative record and the parties' submissions, the Court is persuaded that there is ample admissible evidence to support the conclusion that E Tremont Grocery engaged in trafficking. Plaintiffs have failed to put forth evidence rebutting this well-supported conclusion.

### 1. Reliability of ALERT System

Rather than rebut each cited instance of trafficking, Plaintiffs contend that the FNS's trafficking determination was made "solely" on a "faulty analysis" of EBT data during the Review Period "without any other proof of wrongdoing" or "additional or further investigation." (Compl.¶ 12; Opp. at 2, 7.) But Plaintiffs' "attack on the ALERT System does not create an issue of fact precluding summary judgment" because, to survive summary judgment, "Plaintiffs must show that *each* of the [flagged transactions] were legitimate purchases." Bros. Grocery & Deli Corp., 2021 WL 4443723, at *8 (emphasis added). Hence, "the reliability of the ALERT System as an investigative tool 'is simply not relevant . . . because noncompliance or unreliable investigative methods by Agency representatives would neither fulfill nor excuse Plaintiffs' burden of proof.'" Id. (quoting Timsina v. United States, Case No. 17 Civ. 126, 2019 WL 3254689, at *3 (D. Vt. July 19, 2019)). Moreover, Congress, through the Act and its implementing regulations, has authorized the FNS's use of

"evidence obtained through a transaction report under an [EBT] system" to determine whether a firm is trafficking SNAP benefits. 7 U.S.C. § 2021(a)(2); 7 C.F.R. 278.6(a).

Regardless, the administrative record plainly shows that the ALERT System "does not, by itself, determine or conclude that trafficking has occurred" (A.R. 729), and that the FNS considered information collected during the October and December Store Visits, comparative store EBT transaction data, the availability of local competitors, and individual households' SNAP data, as well as the invoices, customer affidavits, undated store photos, and other documentation put forward by Plaintiffs in their Response to the Charge Letter and in their appeal of the sanction. (See A.R. 563-89, 726-31). Moreover, the ALERT System takes store characteristics into account when it flags EBT transactions, as "stores likely trafficking SNAP benefits have particular transaction patterns or characteristics that are inconsistent with the transaction patterns and characteristics of *similarly situated stores*." (A.R. 726-27) (emphasis added).

2. Flagged EBT Transactions

Alternatively, Plaintiffs argue that the flagged EBT transactions in the aggregate "are neither unusual, irregular, [nor] inexplicable" by virtue of the Store's "location and community in which it was situated." (Opp. at

3.) Plaintiffs claim that "'large transactions' are not unusual or inexplicable where families in New York City use a convenience store to buy their daily and weekly groceries," and that they amount to "nothing more than the expensive cost of goods in New York City." (Compl. ¶ 25; Opp. at 9.) Plaintiffs also assert that the Store sold Halal food and that there "were no other similar providers" in the area, that "the closest supermarket is several blocks away," that the Store took orders by telephone and made deliveries, and that the October and December Store Visits "found that the store was well stocked." (Compl. ¶ 30; Opp. at 4-5.) Plaintiffs explain that the Multiple Transactions are the result of customers buying "items on their way home from picking up their children from school, to and from church[, and] to and from child care centers," as well as customers who "do not own motor vehicles" and therefore "need to make multiple trips." (Opp. at 5-6.)

Plaintiffs' claims that the Store's location and business practices explain the flagged EBT transactions are unavailing for several reasons. First, Plaintiffs have submitted no evidence to support their assertions. Hence, Plaintiffs' "conclusory allegations [and] speculation" have not raised a genuine issue of material fact, as they have not offered any "hard evidence showing that [their] version of

the events is not wholly fanciful." <u>Golden Pac. Bancorp</u>, 375 F.3d at 200 (quoting <u>D'Amico</u>, 132 F.3d at 149).

Second, Plaintiffs fail to explain why E Tremont Grocery exhibited unusual patterns of EBT transactions compared to similar stores located within the same community. E Tremont Grocery had $84,045.66 of SNAP redemptions during the Review Period, whereas the average for similar store types in Bronx County was $25,022.56. (<u>See</u> A.R. 190.) Furthermore, the FNS compared E Tremont Grocery's EBT transactions against those of "nearby firms with comparable or superior stock" and found that the Store's "stock did not appear to explain why these suspicious transaction activities were occurring [in] such large numbers in comparison to nearby comparably or superiorly stocked firms." (A.R. 572.)

Third, Plaintiffs' remaining arguments are either wholly unsupported by admissible evidence or contradicted by the administrative record. Plaintiffs offer no evidence showing that E Tremont Grocery is a purveyor of halal food and that there are no other retailers of halal food in the area. Per the FNS's records of SNAP-authorized retailers, there is "a medium grocery store on the same block [as E Tremont Grocery] and another medium grocery store and a supermarket a block away," and "[w]ithin a half mile radius of [the Store], there [are] two super stores, four supermarkets, three large

grocery stores, and 11 medium grocery stores." (A.R. 728.)
The October and December Store Visit Reports recorded that
E Tremont Grocery did not take orders by telephone or make
deliveries. (See A.R. 61, 109-10.) The October Store Visit
Report documented that the Store had "empty/broken/unused
coolers/freezers," and both the October and December Store
Visit Reports recorded the presence of "empty shelves."
(A.R. 61, 110.) The photographs taken during the October
Store Visit show "a convenience store with deli canned goods
and snack type items." (A.R. 566.) Plaintiffs offered no
evidence to support their assertion that the Multiple
Transactions are the legitimate transactions of customers
traveling to and from school, church, and childcare centers,
or of customers who do not own cars. Indeed, Plaintiffs'
explanations do not account for the fact that 37 of the 86
Multiple Transactions were made between 11:00pm and 5:00am.
(See A.R. 212-16.)

Finally, Plaintiffs have not addressed "each cited
instance of trafficking," let alone shown that each FNS
determination of trafficking was invalid. Capellan, 2020 WL
1047907, at *3 (quoting S.S. Grocery, Inc., 340 F. Supp. 3d
at 180). Hence, Plaintiffs have failed to meet their burden.
Id. "At bottom, the Court is left with an evidentiary record

that contains nothing favorable to Plaintiffs." Muazeb, 2019 WL 1613433, at *11.

Plaintiffs have therefore "failed to present any arguments that sufficiently refute the trafficking charges against them." S.S Grocery, Inc., 340 F. Supp. 3d at 185. Accordingly, the Court finds, by a preponderance of the evidence, that E Tremont Grocery engaged in trafficking violations.

B. PERMANENT DISQUALIFICATION

Having found that the SNAP trafficking violations occurred, the Court finds that the FNS's imposition of the sanction of permanent disqualification from SNAP was not arbitrary and capricious. When the FNS "has followed its guidelines" in imposing a penalty, "the reviewing court may not overturn the decision as arbitrary or capricious." Lugo, 2009 WL 928136, at *2 (quoting Nagi, 1997 WL 252034, at *2); see also 183 Bronx Deli, 2012 WL 2359664, at *4; Young Jin Choi, 944 F. Supp. at 325; Yafaie, 1995 WL 422169, at *1.

"Trafficking is the most egregious type of SNAP violation" because it "defrauds the taxpayer and thwarts the program's goal of helping low-income families put healthy food on the table." (Yorgason Decl. ¶ 7.) See also Abdelaziz v. United States, 837 F.2d 95, 98 (2d Cir. 1988) ("Congress has repeatedly expressed its concern that

31

trafficking . . . was undermining the goals of the food stamp program."). As such, the default sanction for trafficking is permanent disqualification from SNAP, even for a first offense. See 7 U.S.C § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i). The FNS has discretion to issue a CMP in lieu of a permanent disqualification for trafficking if the store "timely submits" substantial evidence showing that it had an effective compliance policy and personnel training program to prevent violations of the SNAP Regulations in place prior to the charged violations. See 7 C.F.R. § 278.6(i). The store's owner must also show that it was "not aware of, did not approve, did not benefit from, or was not in any way involved" in the trafficking violations, or that it was the first such occasion. See id. Under the SNAP Regulations, a request for a CMP and supporting documentation is timely if the the store submits them "within 10 days" of receipt of the charge letter. Id. § 278.6(b)(2)(ii). If a store fails to submit a timely request, however, the store "shall not be eligible for such a penalty." Id. § 278.6(b)(2)(iii). (See A.R. 732.)

The FNS followed its regulations when it declined to impose a CMP and instead permanently disqualified Plaintiffs from SNAP. The Act and the SNAP Regulations *require* a sanction of permanent disqualification for the first occasion of

trafficking, *unless* the FNS determines that the store satisfies the criteria for a CMP in lieu of permanent disqualification. <u>See</u> 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i), (i). The uncontroverted evidence submitted by the FNS shows that Plaintiffs failed to submit a timely request for consideration of a CMP as required by the SNAP Regulations. In its Charge Letter dated December 13, 2019, the FNS warned Plaintiffs that if the FNS determined that they had committed the cited trafficking violations, Plaintiffs faced either permanent disqualification from SNAP or a CMP. (<u>See</u> A.R. 209-10.) The Charge Letter further specified that Plaintiffs had ten calendar days from receipt of the Charge Letter (<u>i.e.</u>, December 23, 2019) to request a CMP and provide documentation showing that the Store had met each of the criteria listed in 7 C.F.R. § 278.6(i). The Charge Letter alerted Plaintiffs that if they did not submit a timely CMP request and supporting documentation, they would "lose [their] right for any further consideration for a CMP." (<u>Id.</u>)

Yet Plaintiffs do not dispute that they failed to request a CMP or provide supporting documentation at any point during the administrative proceedings - let alone within ten days of

the Charge Letter, as required by the SNAP Regulations.[9] (See Yorgason Decl. ¶ 26; Defs.' Stmt. ¶¶ 56, 62.) Indeed, even now, Plaintiffs do not allege, much less demonstrate, that they had implemented a compliance program prior to the trafficking violations. See Nagi, 1997 WL 252034, at *3 (finding permanent disqualification from SNAP not arbitrary and capricious because "Plaintiff has failed to allege, much less demonstrate, that the [store] had such a policy or program [to prevent violations]"). Thus, the FNS's imposition of a permanent disqualification was required by the Act and the SNAP Regulations. See 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i), (b)(2)(iii). "Because the Court cannot overturn a sanction that is authorized by agency guidelines as arbitrary or capricious, the agency's action was valid." Nagi, 1997 WL 252034, at *3; see also S.S. Grocery, 340 F. Supp. 3d at 185; Duchimaza, 211 F. Supp. 3d at 440.

Even if Plaintiffs were eligible for a CMP, however, their permanent disqualification would not be arbitrary and capricious. Whether to impose a CMP instead of permanent disqualification is a determination left to the FNS's

---

[9] Indeed, Plaintiffs failed to timely request a CMP despite requesting and receiving a substantial extension of time to respond to the Charge Letter: Plaintiffs' response was initially due December 23, 2019, but the FNS did not receive the Response Letter until August 6, 2021. (See Defs.' Stmt. ¶¶ 43-48, 51-53; Yorgason Decl. ¶ 15, 19-22; A.R. 237.)

"discretion." Nagi, 1997 WL 252034, at *3; see 7 C.F.R.
§ 278.6(i) ("FNS *may* impose a civil money penalty in lieu of
a permanent disqualification for trafficking," so long as the
store timely requested a CMP with supporting "substantial
evidence" (emphasis added)); 7 U.S.C. § 2021(b)(3)(B) ("[FNS]
*shall* have the discretion to impose a civil penalty . . . in
lieu of disqualification . . . ." (emphasis added)). Thus,
"[t]he mere fact that [the FNS] had discretion to choose
whether to disqualify stores or subject them to a civil money
penalty does not render the penalty imposed here arbitrary
and capricious." Lugo*,* 2009 WL 928136, at *4.

Accordingly, the Court finds that the FNS imposed the
sanction of permanent disqualification from SNAP on E Tremont
Grocery in accordance with the FNS's own regulations and
procedures. The imposition of that sanction was therefore not
arbitrary and capricious. See Willy's Grocery, 656 F.2d at
26; Arias, 2014 WL 5004409, at *11; Nagi, 1997 WL 252034, at
*2-3; Yafaie, 1995 WL 422169 at *1.

C. DUE PROCESS

Finally, Plaintiffs' procedural due process claim fails.
Plaintiffs contend that the FNS's "imposition of a permanent
disqualification . . . violated [their] due process rights."
(Opp. at 2; see also Compl. ¶¶ 18, 33.) However, the
"requirements of procedural due process are met where, upon

35

a challenge to a determination by the FNS to disqualify a firm from SNAP, the court provides a *de novo* review of the disqualification sanction," as set forth above. <u>Muazeb</u>, 2019 WL 1613433, at *8; <u>see</u> <u>id.</u> at *12 (Plaintiffs "cannot succeed on their [procedural due process] claim because they have been given the opportunity in this Court to introduce evidence outside the administrative record, and the Court's *de novo* review of the agency decision 'clearly affords full procedural due process.'" (quoting <u>Ibrahim</u>, 834 F.2d at 53) (alteration omitted)); <u>Duchimaza</u>, 211 F. Supp. 3d at 440; <u>Nagi</u>, 1997 WL 252034, at *3. Having had the opportunity to present evidence of their compliance with SNAP Regulations before this Court, Plaintiffs' procedural due process claim fails as a matter of law.

Even if Plaintiffs' claim were premised on allegations that the FNS violated their substantive due process rights, such claim would fail. (<u>See</u> Opp. at 13 ("[T]he 'rational basis standard' which the Defendant seeks the Court to apply is inapplicable in this case.").) Courts in this Circuit "have adopted a rational basis standard" to evaluate substantive due process arguments challenging SNAP disqualification determinations. <u>Muazeb</u>, 2019 WL 1613433, *12. Since "no fundamental right is implicated by a disqualification decision," the Court need "only determine whether the

disqualification was rationally related to a legitimate governmental purpose." Id. at *8. Because SNAP is designed to "alleviate . . . hunger and malnutrition" by "permit[ting] low-income households to obtain a more nutritious diet," 7 U.S.C. § 2011, "prevention of illegal activity within the Program is a legitimate government purpose." Lugo, 2009 WL 928136, at *4; see also Nagi, 1997 WL 252034, at *3. Thus, to the extent that Plaintiffs' due process claim is based on a claimed violation of their substantive due process rights, Plaintiffs' due process claim fails as a matter of law.

* * *

In sum, the Court thus finds that, even when examined in the light most favorable to Plaintiffs, the undisputed facts establish that the FNS's imposed sanction of Plaintiffs' disqualification from SNAP was valid. The foregoing evidence provides ample support for FNS's determination that E Tremont Grocery engaged in trafficking of SNAP benefits as defined by 7 C.F.R. § 217.2. The undisputed facts likewise establish that FNS's sanction was not arbitrary and capricious, but rather complied with the Act and the SNAP Regulations that govern penalties for trafficking SNAP benefits. See 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i), (i). Finally, the Court's *de novo* review of the evidence ensures that Plaintiffs' procedural due process rights were not

violated. Therefore, the Court finds that Plaintiffs cannot succeed on their claims and concludes that Defendants are entitled to summary judgment dismissing the Complaint.

### IV. ORDER

For the reasons stated above and based on the Court's *de novo* review of the record, summary judgment is hereby **GRANTED** in favor of Defendants United States of America, United States Department of Agriculture, and Food and Nutrition Service on Plaintiffs' claims. Accordingly, all of Plaintiffs' claims are hereby **DISMISSED** with prejudice. The Clerk of the Court is respectfully directed to terminate the motion for summary judgment filed at Dkt. No. 22 and to close this case.

**SO ORDERED.**

Dated:    30 September 2024
          New York, New York

_____
                                    Victor Marrero
                                       U.S.D.J.